IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-02243-RBJ

6 WEST APARTMENTS, LLC, a Colorado limited liability company,

    Plaintiff,

v.

OHIO CASUALTY INSURANCE COMPANY, a New Hampshire Corporation,

    Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is an insurance dispute between plaintiff 6 West Apartments, LLC ("6 West") and defendant Ohio Casualty Insurance Company ("OCI"). Plaintiff sued defendant for failing to pay benefits allegedly owed under a commercial insurance policy. After discovery, OCI moved for summary judgement under Fed. R. Civ. P. 56. ECF No. 34. For the reasons articulated below, that motion is DENIED.

**I.   BACKGROUND**

**A.   The Construction Project and the Insurance Policy**

In April 2018, 6 West broke ground on the construction of an apartment complex in Eagle, Colorado with nine three-story buildings and 120 units (the "Project"). Plaintiff planned to complete the Project by stitching together "modular building units" delivered by a subcontractor to the job site. ECF No. 34-2. The modular units arrived at the job site with interior paint, flooring, and appliances. ECF No. 34-5 at 30. Plaintiff's general contractor,

1

Evans Chaffee Construction Group ("ECCG"), began the process of rigging and stacking the units, connecting plumbing and utilities, finishing the roof and exterior, building hallways, and performing all other services required to turn these units into finished apartment buildings. ECF No. 35-2 at 15; *see also* ECF No. 34-4 at 36–37.

Plaintiff purchased a "Builders Risk" insurance policy from OCI, effective April 3, 2018, to April 3, 2019 (the "Policy"). ECF No. 35-1. The Policy contained the following coverages:

> 1. **Coverage** – "We" [OCI] cover direct physical loss caused by a covered peril to buildings and structures while in the course of construction, erection, or fabrication.
>
> Buildings and structures in the course of construction is limited to:
>
>   a. materials and supplies that will become a permanent part of the buildings or structures;
>
>   b. foundations, excavations, grading, filling, attachments, permanent fencing, and other permanent fixtures;
>
>   c. scaffolding, construction forms or temporary fencing at the described "jobsite"; and
>
>   d. temporary structures at the described "jobsite"

ECF No. 35-1 at 69. The Policy also contained limitations and exclusions. Relevant here, the Policy excluded "Standing Building[s] Or Structure[s]" from coverage. Under the section "Property Not Covered," the Policy stated the exclusion and defined "standing building or structure" as follows:

> 5. Standing Building Or Structure – "We" do not cover any:
>
>   a. standing building or structure;
>
>   b. part of a standing building or structure; or
>
>   c. standing building or structure to which additions, alterations, improvements, or repairs are being made.
>
> A standing building or structure means any building or structure that has been wholly or partially constructed, erected, or fabricated. A standing building or structure also means any building or structure that is in the process of construction, erection, or fabrication at the inception of this policy.

2

*Id.* at 70.

The Policy also specified "What Must Be Done In Case Of Loss."  Four requirements are relevant in this case:  First, a prompt notice requirement.  *Id.* at 80 ("In case of a loss, "you" must: a. give "us" or "our" agent prompt notice including a description of the property involved.").  Second, a proof-of-loss provision stating that the insured "must send" the insurer "a signed sworn proof of loss."  *Id.* at 81.  The sworn statement "must include" information about the loss, other insurance policies, ownership information, and "estimates, specifications, inventories, and other reasonable information that 'we' may require to settle the loss."  *Id.*  Third, various examination provisions state that the insured "must submit to examination under oath," "produce records," and "exhibit damaged property" as often as OCI "reasonably request[s]."  *Id.*  Finally, a cooperation provision says that the insured "must cooperate with 'us' in performing all acts required by this policy."  *Id.*

### B. The Insurance Claims

The Project incurred damage that caused 6 West to file a claim on at least two occasions during the Policy coverage period.  Plaintiff filed the first claim on August 7, 2018.  ECF No. 34 at ¶11.  OCI inspected the damage and issued 6 West a check for $77,234.  *Id.* at ¶12.  Plaintiff did not cash the check because it was informed by ECCG that the amount was insufficient to cover repair costs.  ECF No. 35 at 6.

Processing this first claim included some back-and-forth between 6 West, its agents, and OCI.  In an email to 6 West's subcontractor, OCI asked the contractor to take reasonable steps to fix or protect the property from further damage and photograph the damages fixed in such repairs "if possible."  It also requested the contractor "keep track of all costs incurred as a result of this incident."  The full text of the email reads as follows:

> If your property requires immediate repairs to avoid further loss or damage, please take reasonable steps to get it fixed, or otherwise protect it from further damage. If possible, take photographs showing general views of the damaged property and close-ups prior to removal and/or repair. Please save the damaged property in case we need to inspect it.
>
> Please also keep track of all costs incurred as a result of this incident. This includes estimates, invoices, vendor reports, and any other documents that may be necessary to verify the details your claim. Costs incurred are subject to your policy's terms and conditions.

ECF No. 35-5.

OCI also included a disclaimer in its repair estimate sent to OCI alongside the $77,234 payment. The disclaimer directed 6 West to contact OCI "immediately if additional damages are found or if your contractor estimate is higher than our estimate" and noted the importance of giving OCI "the opportunity to address additions or changed to the estimate, before you have those repairs completed." ECF No. 34-6 at 3. It also instructed 6 West to contact OCI with additional questions and emphasized that "actual policy language and definitions" were provided by the Policy. *Id.*

Plaintiff filed its second claim on November 4, 2018 seeking coverage for water damage to interior drywall in buildings 7 and 9. ECF 34 at ¶ 16. In December, OCI inspected the two buildings and sent 6 West a loss report and payment of $3,287 on January 2, 2019. *See* ECF No. 34-8 at 2–3. The loss report found that some of the drywall damage in the modules was from "transport and the setting of the modules" and some from "water penetration" caused by an unexpected storm. ECF No. 34-8 at 12. The loss report assumed there to be water "frozen in the ceilings" that might potentially cause additional damage. *Id.* The loss report also noted that the inspector could not inspect Building 9 because it was unheated so "[t]here may be more issues in [Building] 9." *Id.*

On March 20, 2019, 6 West's contractor notified OCI of additional water damage to Buildings 1, 3, 4, and 5. ECF No. 34 at ¶20. On April 24, the contractor informed OCI that the full cost of the claims for water damage was $560,455. ECF No. 34-1 at 24–25. The contractor stated that 6 West had never accepted any money from OCI because 6 West had contested both disbursed payments as insufficient. *Id.* at 24–26.

In response to this information, OCI began scheduling meetings and inspections, and it hired a building consultant to help evaluate the claim. *Id.* at 24–25. After a few months of back-and-forth that included on-site meetings and requests for documentation, 6 West and ECCG submitted an Amended Water Damage Claim. ECF No. 34-10. This Amended Claim included three photographs labeled "example[s]" of "screw pops," *id.* at 5–8, a summary of repair costs incurred, *id.* at 10, an invoice from the subcontractor who replaced and repainted the damaged drywall, *id.* at 14–16, and an overlay of the actual construction schedule with the original contract schedule for the damaged buildings, *id.* at 17–29.

Importantly, the Amended Claim also included statements explaining that ECCG believed it had complied with OCI's documentation requirements. ECCG said that screw pops "are very difficult to photograph" so it "did not attempt to photographically document every area of loss[,] nor w[as it] told to." *Id.* at 7. ECCG quoted OCI's earlier email directing ECCG to "keep track of all costs incurred . . . includ[ing] estimates, invoices, vendor reports, and any other documents . . . ." *Id.* at 7–8; *see also supra* at p.#. ECCG claimed that OCI's estimator had, during an in-person meeting, told it to "[k]eep records of the expenses and submit them when the extent of the claim is known." *Id.* at 8. According to ECCG, "[a]t no time were we ever told to do anything more than this. We have met these requirements." *Id.*

While OCI's inspector was creating and finalizing a repair estimate, OCI engaged in an increasingly contentious discussion with 6 West and its agents. OCI repeatedly reviewed information submitted by 6 West and requested additional documentation. *See, e.g.*, ECF No. 34-1 at 19. Plaintiff continued to "reiterate" that it had not previously been asked for such extended documentation and expressed frustration at both the requests for "after the fact" documentation and the delay in being "made whole" on the claim. *Id.* at 13–14. Defendant continued to dispute that it had instructed the contractor "to simply keep track of all costs and submit for reimbursement," and advised that it would have been "unreasonable to assume" OCI would accept extensive claims for repair costs that differed so drastically from the damages found on inspection. *Id.* at 12–13.

In total, plaintiff claims to have incurred $792,587.81 in repair costs covered by the Policy. ECF No. 35-8 at 1. Defendant paid a total of $294,162 for the claims, which plaintiff rejected as insufficient. *See* ECF No. 34 at ¶ 35.

This suit followed. After discovery, defendant moved to for summary judgment under Fed. R. Civ. P. 56.

## II. STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs.*, Inc., 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the

light most favorable to the non-moving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "[T]he facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III.   ANALYSIS

#### A.   Whether The Claimed Losses Are Excluded by the Policy

Defendant claims that the Policy did not cover damage to the modular building units. The Policy excluded "Standing Building[s] or Structure[s]" from coverage and defined such structures as "any building or structure that has been wholly or partially constructed, erected, or

7

fabricated," including those to which "additions, alterations, improvements, or repairs are being made." ECF No. 35-1 at 70. Defendant argues that the modular housing units, which were constructed offsite, fit within this exclusion. Defendant quotes testimony describing the modular units as "complete" and "ready to move in" when delivered. ECF No. 34 at 13. It argues that the plain language of the Policy excludes the modular building units from coverage. Plaintiff's stacking, stitching, and finishing the units, according to defendant, constituted "additions, alterations, [and] improvements" encompassed by the standing structure exclusion.

Plaintiff responds in two ways. First, it argues that the exclusion does not apply because the Policy's language is ambiguous, and the circumstances evince a mutual intent that the Policy would cover the modular housing units. *See* ECF No. 35 at 14–18. Second, it asks that defendant be estopped from asserting this exclusion, which was first raised at summary judgment. *Id.* at 12–14. I will consider these arguments in turn.

I find that defendant is not entitled to summary judgement on its claim that the Policy excludes the modular housing units. Because the parties agree that plaintiff has coverage, "[t]he burden is on the insurer to establish the applicability of an exclusion from coverage." *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1287 (10th Cir. 2006) (quoting *Fire Ins. Exch. v. Bentley*, 953 P.2d 1297, 1301 (Colo. App. 1998)).

Courts interpret insurance policies under the same principles employed in ordinary contract interpretation. *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995). In interpreting insurance policies, a court must give effect to the intent and reasonable expectations of the parties and enforce the policy's plain language, unless it is ambiguous. *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). Conflicting or ambiguous provisions of an insurance policy are resolved in favor of coverage. *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d

8

236, 239 (Colo. 1992) ("When provisions of an insurance policy conflict, they are to be construed against the insurer and in favor of coverage to the insured."); *Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1284 (10th Cir. 2011) ("[B]ecause of the unique nature of insurance contracts and the relationship between the insurer and insured, [we] construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." (quoting *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo.2003)) (alteration in original)).

The Policy's language is contradictory and ambiguous. It covers "buildings and structures while in the course of construction," ECF No. 35-1 at 69, but excludes "any building or structure that is in the process of construction," *id.* at 70. The limits of the "Standing Building or Structure" exclusion are not plain and unambiguous, as defendant asserts. I find it impossible to construe the exclusion without more evidence of the parties' intent and perhaps trade usage. The conflicting Policy provisions incline me towards finding that the modular housing units are covered. *See Greystone*, 661 F.3d at 1284.

The record before me and Tenth Circuit caselaw provide additional evidence that the parties intended the Policy to cover the modular housing units. According to plaintiff's expert witness, builders' risk policies typically cover partially preassembled building components like the modular housing units. ECF No. 35-12 at ¶¶8, 9. Plaintiff represents that the modular units comprise half of the project cost on which the Policy premiums were based. ECF No. 35 at 18. It also notes that the Policy covered an offsite location used for inspection and storage of the modular housing units. *Id.*

Plaintiff explains that standing structure exceptions typically exclude pre-existing or partially completed buildings at the job site, not modular building components. *Id.* at 15.

Plaintiff contrasts this case with *Gerald H. Phipps, Inc. v. Travelers Property Casualty Company of America*, 679 Fed. App'x 705 (10th Cir. 2017) (unpublished), where the Tenth Circuit found that an insurance policy did not cover water damage to preexisting structures. *Id.* at 709–10. Defendant responds that the policy in *Phipps*, unlike OCI's policy, explicitly excluded standing buildings or structures "at the job site." ECF No. 36 at 7. The *Phipps* court granted the defendant's summary judgment because snowmelt had damaged the pre-existing library building and not the contactor's work. *Id.* at 7–8. Defendants argue that this Court should do the same and grant defendant's motion for summary judgment because water had damaged the modular housing units rather than plaintiff's work.

I find that *Phipps* supports plaintiff's position. The *Phipps* plaintiff was renovating a university library but, because of asbestos concerns, was directed to conduct only "limited" renovations, like replacing handrails and updating lighting fixtures, in elevator shafts and stairwells. *Phipps*, 679 Fed. App'x at 710. Snowmelt leaked into the building and damaged drywall and insulation in the elevator shafts and stairwells. *Id.* Although the *Phipps* plaintiffs had initially planned to leave the drywall and insulation undisturbed, following the water damage they replaced the damaged drywall and insulation and filed a claim under their builders' insurance policy. *Id.* The Tenth Circuit, affirming summary judgment for the defendants, found that the elevator shafts and stairwells were excluded from coverage as "[b]uildings or structures that existed at the 'job site' prior to the inception of th[e] policy." *Id.* at 708–09.

*Phipps* sheds light on the meaning of "building or structure" in a policy exclusion and supports plaintiff's contract interpretation. The library being renovated by the *Phipps* plaintiff was a complete building that predated the policy. Before renovations began, the library was a fully functioning building most likely covered by property insurance. Plaintiff argues that it

10

reasonably interpreted the Policy to exclude similar buildings. ECF No. 35 at 15 ("For example, if 6 West were making additions onto a pre-existing housing unit that was standing on the job-site, the builders' risk policy would cover only the new construction and not the pre-existing housing unit to which the additions were being made."). Because the record permits the inference that the modular housing units — unheated, unroofed, unfinished, and unlivable — were not the type of "standing building or structure" typically excluded from coverage, plaintiff may have reasonably expected them to be included under the Policy. *See Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007) ("In interpreting a contract, we give effect to the intent and reasonable expectations of the parties.").

Defendant argues that *Phipps* is important because the policy in that case specified that standing buildings or structures "at the job site" were excluded from coverage. *Phipps*, 679 F. App'x at 709. The Policy in this case, by contrast, does not specify that the exclusion applies only to standing buildings "at the job site" and therefore evinces an intent to exclude preexisting modular units constructed offsite. This is a plausible argument, but it cannot win at the summary judgment stage. The record contains sufficient evidence to conclude that the modular housing units were not "buildings or structures" under the Policy. If they are not buildings or structures, it makes no difference whether the Policy excludes offsite buildings or structures.

The preceding discussion should not necessarily be read as my final legal construction of the contract. Additional evidence is likely to shed light on the parties' intentions regarding coverage for the modular housing units. Plaintiff says that OCI's "underwriting file, underwriting guidelines, and deposition testimony" on the standing structure exclusion might prove whether or not the modular units were covered by showing if the Policy's premium and coverage limit calculations included the modular housing units. ECF No. 35-12 at ¶7. I agree.

If defendant wishes to argue at trial that the standing structure exclusion applied to the modular housing units, it must provide plaintiff the information that the expert witness indicated he would need.[1]  Otherwise, my conclusion, which is based on the current record, that the parties intended the Policy to cover the housing units will be the law of the case.

### B. Whether Plaintiff's Acts and Omissions Bar Recovery

Defendant argues that plaintiff cannot recover because it failed to perform conditions precedent for payment.  ECF No. 34 at 11–13.  Specifically, it alleges that plaintiff failed to timely notify defendant of damage, document damage, and allow inspection before conducting repairs.  *Id.*  Plaintiff responds that it did perform the actions in question, and, in any case, those actions are not conditions precedent whose non-performance would bar recovery under the Policy.  ECF No. 35 at 7–12.

The parties argue about two types of requirements contained in the Policy: notice and cooperation requirements.  Existing caselaw treats these requirements differently, and I will consider them in turn.

#### 1. Prompt Notice Requirement

The Policy contains a prompt notice requirement.  *See* ECF No. 35-1 at 80 ("Notice -- in case of a loss, 'you' must: give 'us' or 'our' agents prompt notice including a description of the property involved . . . .").

"A prompt notice requirement in an insurance policy 'means that notice must be given within a reasonable length of time under the circumstances.'  In the property/casualty insurance

---

[1] I do not find that defendant waived its exclusion argument.  It left open the possibility that exclusions might apply.  Moreover, my order ensures that plaintiff is not prejudiced by OCI's delay in raising this argument because I am requiring OCI to provide plaintiff with exactly what it claims to require if OCI wishes to pursue this argument further.  *See Tarco, Inc. v. Conifer Metro. Dist.*, 316 P.3d 82, 86 (Colo. App. 2013) (stating that a defendant is barred from raising an affirmative defense for the first time at summary judgment when doing so would prejudice the plaintiff).

12

context, the duty to give notice 'arises when an insured, with reasonable diligence, can ascertain that the [the property has been damaged by a covered event].'" *656 Logan St. Condo. Ass'n, Inc. v. Owners Ins. Co.*, 389 F. Supp. 3d 946, 950 (D. Colo. 2019) (quoting *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 226 (Colo. 2001)) (alteration in original).

Defendant claims that the Policy's notice requirement is a condition precedent. Plaintiff's alleged failure to promptly notify defendant of water damage, defendant claims, would bar recovery. Plaintiff responds that failure to notify is necessary but not sufficient for forfeiture of the right to recover — an insurer must also show that a failure to notify prejudiced the insurer. Defendant contests the applicability of this so-called "notice-prejudice" requirement.

The parties' differing interpretations of Colorado law reflect a doctrine in flux. Colorado has long adopted a pure notice legal regime, which does not require the insurer prove prejudice to be excused from coverage when the insured failed to provide proper notice. *See Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 288–91 (Colo. 1981) (citing, inter alia, *Barclay v. London Co.*, 46 Colo. 558, 105 P. 865 (1909)). The Colorado Supreme Court has inched towards a notice-prejudice regime. It first adopted the notice-prejudice rule for uninsured motorist claims, *see Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 230 (Colo. 2001), and then did the same for liability policies, *see Friedland v. Travelers Indemnity Co.*, 105 P.3d 639, 645–46 (Colo. 2005); *see also Craft v. Philadelphia Indemnity Insurance Co.*, 343 P.3d 951, 956 (Colo. 2015) (confirming that *Friedland* established a notice-prejudice rule for liability insurance cases).

The cases establishing notice-prejudice regimes for some insurance contracts contain policy justifications and broad language that makes their applicability to other insurance regimes unclear. This district has split on the question of whether the notice-prejudice rule applied to property/casualty insurance policies. *Compare Cherry Grove East II Condominium Association,*

13

*Inc. v. Philadelphia Indemnity Insurance Co.*, No. 16-cv-02687-CMA-KHR, 2017 WL 6945038, *5 (D. Colo. Dec. 20, 2017) (finding that the policy factors underlying adoption of the notice-prejudice rule in other contexts did not counsel in favor of extending the notice-prejudice rule to property/casualty claims) *with Hiland Hills Townhouse Owners Association, Inc. v. Owners Insurance Co.*, No. 17-cv-1773-MSK-MEH, 2018 WL 4537192, *6 (D. Colo. Sept. 20, 2018) (concluding the opposite).

In *656 Logan Street*, Judge Martinez thoroughly assessed the Colorado Supreme Court's precedents and concluded that it was not yet time for this district to adopt a notice-prejudice rule for property/casualty claims brought under homeowners' association policies. *656 Logan Street*, 389 F. Supp. 3d at 956 ("The odds are probably better than even that the Colorado Supreme Court will someday overrule [the pure notice regime] as to all or mostly all occurrence-based policies. But thus far the Colorado Supreme Court has consciously and affirmatively avoided that outcome, and there is no sound basis for this Court to finish a job the Colorado Supreme Court chose not to take up."). I am inclined to agree with Judge Martinez's analysis,[2] but I recognize that the relevant considerations identified by the Colorado Supreme Court might yield a different conclusion when applied to this case's specific facts. As trial approaches, I invite the parties to explicitly analyze the "three policy justifications for departing from the traditional [pure notice] approach," *Clementi*, 16 P.3d at 229, and analogize relevant Colorado Supreme Court cases including *Maerz*, *Friedland*, *Clementi*, *Craft*, and *Travelers Prop. Cas. Co. of Am. v. Stresscon Corp.*, 370 P.3d 140 (Colo. 2016).

---

[2] Plaintiff's citation to *Travelers Property* for the proposition that the notice-prejudice rule must apply here is unavailing. *See* ECF No. 35 at 9. The cited portion of *Travelers Property* is not a holding citing *Friedland* but merely a summary of that case.

14

I need not determine whether to apply the notice-prejudice rule to deny defendant's motion for summary judgment. There is sufficient evidence for a reasonable jury to find that plaintiff timely notified defendant, so the question of prejudice is irrelevant. *See Friedland*, 105 P.3d at 643 (explaining that a court need only consider prejudice after a finding that timely notice was not given). Notice is prompt if "given within a reasonable length of time under the circumstances." *Clementi*, 16 P.3d at 226. OCI cries foul because, over the course of many months, plaintiff's claims grew and grew. From defendant's perspective, the steady of drip of new damages "discovered" and the corresponding increase in claimed damages indicate that either plaintiff was not forthcoming in their initial claim or that plaintiff's subsequent claims lacked validity.

A jury might agree with defendant, but the issue is not beyond dispute. Plaintiff provides a cogent explanation for the timeline on which it provided notice. According to the contractor's deposition, water entered the units and, unbeknownst to the contractor, pooled in the ceiling above impermeable plastic. ECF No. 35-4 at 6. Some of it dripped down and caused damage immediately. *Id.* Much of it froze in the unheated units. *Id.* Months later the weather warmed, and heat was brought online, thawing the ice which then dripped down into the walls and ceilings. *Id.* at 8. Some water damage was apparent at that time, but other damage could not be seen until the drywall had dried out and shrank back to size, leaving only the drywall compound over screw heads swollen with water. *Id.* This testimony provides a thorough account of how it could be possible that the damage from a single weather event could reveal itself over the course of many months. Because a jury could credit this testimony and find that plaintiff notified defendant in a reasonable amount of time after discovering each new bit of damage, defendant is not entitled to summary judgment on the issue of failure to notify.

2. Cooperation Requirements

Defendant argues that plaintiff breached the Policy's examination and cooperation conditions and therefore forfeited their right to recover. Defendant claims that the Policy required plaintiff to wait for defendant's inspection before repairing damages, to document or photograph the damages, and to document the scope of repairs in detail. Defendant notes that "[u]nder Colorado law, an insured may forfeit the right to recover under an insurance policy if he or she fails to cooperate in violation of a policy provision." *Walker v. State Farm Fire & Cas. Co.*, No. 16-CV-00118-PAB-STV, 2017 WL 1386341, at *3 (D. Colo. Feb. 23, 2017), *report and recommendation adopted*, No. 16-CV-00118-PAB-STV, 2017 WL 1386346 (D. Colo. Mar. 17, 2017).

Defendant's arguments fail at this stage for three independent reasons. First, failure to cooperate does not bar recovery absent a showing of prejudice to the insurer. Second, the Policy's cooperation requirements are best read as promises, not conditions precedent. Finally, the record could support a jury determination that plaintiff did comply with the cooperation provisions.

An insurer is not excused from providing coverage when an insured fails to cooperate unless they show actual prejudice. The prejudice rule is well-established in the failure-to-cooperate context even though it is unsettled in the failure-to-notify context. Defendant has not cited a single failure-to-cooperate case in which prejudice was not required. *See Hall v. Allstate Fire & Cas. Ins. Co.*, No. 119CV02604-DDD-NYW, 2021 WL 119344, at *3 (D. Colo. Jan. 12, 2021) ("The failure to cooperate is a breach of an insurance contract only if the insurer suffers a material and substantial disadvantage."); *Walker*, 2017 WL 1386341, at *3 (same); *Haptonstall v. Am. Fam. Mut. Ins. Co.*, No. 19-CV-00037-CMA-KLM, 2021 WL 392601, at *5 (D. Colo. Feb. 4, 2021) ("An insured who fails to cooperate breaches the contract if his or her failure

creates a material and substantial disadvantage to the insurer."). Defendant does not claim that it was prejudiced by 6 West's failure to cooperate. It is not therefore entitled to judgment as a matter of law.

Second, the Policy's cooperation provisions are best read as promises rather than conditions precedent. Where an insurance contract contains a condition precedent, performance of that condition is a prerequisite to recovery on the policy. *See Hurt v. N.Y. Life Ins. Co.*, 51 F.2d 936, 938 (10th Cir. 1931). A provision "will not be construed as a condition precedent unless that intention is clearly and unequivocally stated in the contract." *Sec. Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 976 (10th Cir. 1976).

Defendant argues that the Policy's cooperation provisions impose hard requirements. It notes the section describes "what *must* be done in case of loss" and repeatedly emphasizes that an insured "must" cooperate in specific ways. ECF No. 35-1 at 81. Plaintiff argues that this language is merely precatory. I agree.

In *Praetorian Ins. Co. v. Axia Contracting, LLC*, 488 F. Supp. 3d 1042 (D. Colo. 2020), this district found that a policy's requirement that the insured maintain fences around the jobsite was not a condition precedent. *Id.* at 1048. The policy at issue said that the site "will be" protected with a fence, that gates "shall" remain secure, and that the insured is "required to maintain" fences and other devices. *Id.* at 1046. The court held that, despite this seemingly imperative language, the policy requirements were exclusions and not conditions precedent.

The same analysis applies here. Despite the Policy's strong language, I find that the requirements are not conditions precedent. The intent to create a condition precedent does not appear expressly or by clear implication, *Charles Ilfeld Co. v. Taylor*, 379 P.2d 748, 750 (Colo.

17

1964), and, in any case, uncertainty is resolved in favor of the insured, *see Greystone*, 661 F.3d at 1284.

Finally, the record does not clearly show that plaintiff failed to cooperate as required by the Policy. The insurer bears the burden to prove failure to cooperate. *Soicher v. State Farm Mut. Auto. Ins. Co.*, 351 P.3d 559, 564 (Colo. App. 2015). It has not done so here.

"Generally, the question of whether the insured has violated his insurance policy by failing to cooperate with the insurer is a question of fact." *Farmers Automobile Inter-Insurance Exchange v. Konugres*, 202 P.2d 959 (Colo. 1949). The reasons for allowing a jury to determine such an issue are especially acute in this case where the Policy's provisions all require "reasonable" cooperation. *See* ECF No. 35-1 at 81. The jury is best positioned to determine whether plaintiff's actions were reasonable. *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1201 (D. Colo. 2018). The record before me is not so clear that all reasonable juries would reach the same conclusion.

### C. Whether Plaintiff's Statutory Claims Can Proceed

Plaintiff's statutory claims may also proceed. The record does not indisputably show, as defendant argues, that OCI's investigation and payments were done "in good faith." ECF No. 36 at 9. Instead, the record shows delays in payment and a disparity of nearly half a million dollars between plaintiff's claimed damages and defendant's tendered payment. If a jury decides that plaintiff was owed over $700,000, it might find that defendant's refusal to offer more than $300,000 was done in bad faith.

### ORDER

For the foregoing reasons, defendant's motion for summary judgment, ECF No. 34, is DENIED.

DATED this 25th day of October, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge