IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02243-RBJ-MEH

---

VIDEOTAPED AND VIDEOCONFERENCE DEPOSITION OF DAMIAN J. ARGUELLO — July 1, 2021

---

6 WEST APARTMENTS, LLC,

Plaintiff,

vs.

THE OHIO CASUALTY INSURANCE COMPANY,

Defendant.

---

The videotaped deposition of DAMIAN J. ARGUELLO, taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Summit and the State of Colorado, on Thursday, July 1, 2021, at the hour of 10:01 a.m.

EXHIBIT
A

retention then?
A. I -- I mean, it may say it more clearly in the retention agreement, but -- but, I mean, I -- that means to evaluate and -- and write a report. It's something that my opinion would be that -- that the claims handling was not to standards, as well as deliver testimony if -- if required.
Q. Okay. Okay. Now, since we're on page 26, let's go into your next section of your report, which was Factual Overview.
What I notice here is you basically do a chronology from documents that you reviewed; is that correct?
A. Yes.
Q. Okay. And in this chronology, are you -- when you make reference -- well, let's flip to the -- well, first -- strike that, all that.
The -- you start off by referencing the policy; is that right?
A. Yes.
Q. Okay. And then in your reference you -- you make citation to the policy; is that right?
A. Yes.
Q. Okay. I'm just -- again, I know this sounds probably pretty elementary, but I'm just

trying to make sure that I understand how -- how you formulated your report.

A. Okay.

Q. Okay. So then you go through provisions that you cite out of the policy.

MR. LUDWIG: If we could continue on through to the next page. Continue on, okay, to page 28.

Q. Okay. Now on 28 you start your chronology and you start with Item No. 2. You say, "On 7-11-2018 a water-related incident occurred," and you cite to the complaint as your basis for that statement; is that right?

A. Yes.

Q. Okay. And then if we continue down, you say, "On August 7th, 2018 6 West filed Claim No. 23446 -- 463 -- 2344634" -- I think we're missing a number there. I think it's supposed to be 23448634 -- "with Ohio Casualty." And -- and here you cite to the claim notes. So that would indicate that you did review the claim notes; is that right?

A. Yes.

Q. Okay. Now, when you make these -- the information contained in these numbered paragraphs throughout your chronology, you're paraphrasing

these documents you reviewed; is that correct?
A. That's correct. If I directly quote the document, I would either put -- put it in quotation marks or -- or indent it.
Q. Okay. So in each one of these numbered paragraphs you're providing us your impression of the document review; is that right?
A. Correct.
Q. Okay.
MR. LUDWIG: If we could flip to the next page then. Actually, let's continue flipping through to, let's say, page 31 of the report. One more page. Okay.
Q. Here's -- here's what I am curious about. Do you see the first -- the end of your paragraph 24, you cite, make citation to 6 West documents. Do you see that? You say "6 West 43 through 44"?
A. Oh, at the end of paragraph 23?
Q. Right.
A. Yes.
Q. Do you see your citation there?
A. Yes.
Q. Okay. So to me that would indicate that you also reviewed some of the 6 West documents produced; is that right?

A. Correct.
Q. Did you graduate in June of that year? Is that right?
A. I think it was June, yes.
Q. Okay. Then if we flip forward to page 4 of Exhibit A, we can start working in a chronological order here.
You -- then in 1991 you went for Craw -- you went to work for Crawford & Company; is that correct?
A. Yes.
Q. Okay. Do you recall when you started with them in 1991?
A. I think it was sometime in the spring, probably March or April.
Q. Okay. In the body of your report you -- you give us a little bit more information on your experience, and you -- and you say in that portion that you went to Crawford & Company's adjuster school in Atlanta; is that right?
A. Yes.
Q. And you said you did that in the fall of 1991?
A. Yes.
Q. Would that have been something you would

have done when you initially hired on with them, or would that have come later?

A. So the way it worked at Crawford, when I started in the spring, I started as -- I don't remember what the exact job title was, but basically like an assistant adjuster. And I did that job for -- I -- it was maybe a month or so. And then when an -- an opening occurred, I was promoted to be an adjuster.

And then it was basically on-the-job training until, you know (interruption) at the -- at the adjusting school. So that's why I got my training in the fall as opposed to when I initially started. I did receive on-the-job training and supervision as -- as well.

Q. Okay. So you were more or less an assistant. You set up for how many months, you said?

A. For about a month, as I recall.

Q. Okay. And then you got a promotion, you said, and you were an actual adjuster at that time?

A. Correct.

Q. Okay. Were you working with someone, since you hadn't had any training yet?

A. Yes. I -- I worked with a couple of

different supervisors and -- and a claims manager as -- as well as very closely with outside counsel on -- on the ongoing claims.

Q. Okay. And then in the fall you went to Atlanta and you received training, adjuster training from them?

A. Formalized training, yes.

Q. Did you ever obtain a -- a Colorado adjuster's license?

A. Yes. Back then Colorado did license individual adjusters, and I obtained my license in -- in Colorado I think sometime that -- that fall after the training. Because one of the things that the training course did was -- was go over all the requirements for licensing in the various states.

Q. And you still hold that license?

A. No. Colorado stopped requiring individual licenses for adjusters I think in 1992 or '93, sometime when I was with CNA. And so only public adjusters are required to be licensed individually in Colorado currently.

Q. Okay. During your time with Crawford & Company, what was your authority as a -- an adjuster?

A. If you're referring to financial

authority, it really --
Q. Right.
A. It really depended on the client. And our clients were both insurance companies as well as self-insured companies. So they -- they gave Crawford individual levels of authority based on their agreements, and then some amount of that authority would be extended to adjusters. So it really just depended.
Q. So what was your authority?
A. Well, it depended again on the client.
Q. Well, what was the -- what was the maximum authority you had while working with Crawford & Company?
A. As -- as I recall during my tenure, I think the -- the biggest amount of authority I had was $50,000.
Q. Okay. You say while you were at Crawford you managed -- you investigated, managed, and settled a number of different kinds of claims, okay, including CGLs, which would be commercial general liability policies; is that right?
A. Yes.
Q. Auto, workmen's comp, property, and PIP. What's PIP?

A. Personal injury protection, which was also known as no fault, that we used to have in Colorado at that time.

Q. Okay. So you didn't do any builder's risk claims while you were at Crawford & Company; is that right?

A. I don't recall doing any builder's risk claims. I did do some commercial property claims.

Q. Okay. While you were at Crawford & Company, were you ever certified as a large loss adjuster?

A. No.

Q. Were you ever part of a large loss team?

A. I don't recall.

Q. Okay.

A. If -- if I -- if I was part of a large loss team, it would have been on an ad hoc basis for an individual loss. I was not part of a -- a standing large loss team, no.

Q. Okay. Then you moved on to CNA Companies, you were in Colorado with for about three years; is that right?

A. Yes. It was -- yes.

Q. Okay. And you were focused -- your -- your work there with -- with CNA, at least while you

were in Colorado according to your resumé, was focused on workers' compensation claims; is that right?
A. Yes.
Q. Okay. Did you do any builder's risk claims while you were at CNA in --
A. No.
Q. -- Colorado?
A. No.
Q. No?
A. Exclusively workers' compensation.
Q. Okay. And then you moved on to Chicago, Illinois and Melville, New York, where you -- in your report you describe in detail the work that you performed during that time, so we won't belabor that any.
Okay. So then you entered law school in 2003; is that right?
A. 2001.
Q. 2001. Okay.
And when you -- now -- okay. Well, prior to that you worked for Talbot Agency; is that correct?
A. Yes.
Q. Okay. And what is Talbot Agency?

A. Talbot Agency was a large insurance brokerage, that we were in the top 20 by commission volumes in the United States, and they were headquartered in Albuquerque. Primarily they were located throughout the -- the Western United States.

Q. Okay. And it seems from your vitae and your description in your report that your focus while at Talbot Agency was on E&O claims; is that right?

A. No. What it -- what it was was I was initially hired to be the claims manager for the Albuquerque office, primarily to serve as a liaison between the large commercial policyholder accounts and insurance companies involving claims and addressing coverage disputes, valuation disputes, as well as facilitating the prompt handling of claims.

As time went on and Talbot was growing quickly through acquisition, in other words they were buying agencies around the country, they began to have more errors and omissions claims exposures for, you know, agency. Like, they were basically their malpractice claims. And I began to assist with those that occurred in the Albuquerque office, and that evolved into a position where I served as the E&O claims manager for the -- for the

brokerage nationwide.

Talbot was owned -- at that time they were a wholly-owned subsidiary of Safeco Insurance, so we had a -- a fronting E&O policy with a large SIR. So Talbot was given authority to handle its own claims up to a certain amount, with -- with input from Safeco's risk management group. So I handled those claims.

And -- and then later, as I say in my report, that led to me leading the effort to revamp Talbot's procedures to try to reduce E&O exposure and deliver better service to clients.

Q. Okay. Did you handle any builder's risk claims while you were at Talbot?

A. So we -- with -- with a few exceptions, we didn't handle claims directly. Our -- our job was to serve as a consultant to the policyholder, kind of like a public adjuster would, to basically advocate for the policyholder. And in that role, I advocated on a number of builder's risk claims that our clients had.

Q. Okay. Did you -- at -- during your time at Talbot, did you hold a -- a -- a New Mexico public adjuster's license?

A. No. Since I wasn't adjusting claims

2016; is that correct?
A. Yes. I actually started at DGS in the summer of 2003 as a summer associate and continued clerking for them during my third year of law school, and then became an associate upon graduation in 2004 and passing the Bar.
Q. Okay. And from there you went to Levin Sitcoff, and that -- that's a plaintiffs' firm; is that right?
A. It's a -- a policyholder litigation firm, yes.
Q. Okay. You were there for, what, about a year and a half; is that fair?
A. I was there for about ten months as a -- as essentially an associate. I think Brad Levin is the only true shareholder with equity in the firm. And then I was of counsel for two -- about two years after I -- I opened my own firm in 2017.
Q. Okay. And then you formed your own firm in January 2017; is that right?
A. Yes.
Q. Okay. And your firm, you say, represents commercial policyholders; is that right?
A. That's our primary type of client, yes.
Q. Okay. And about what percentage of your

work is representing commercial policyholders?
A. As opposed to other kinds of legal work?
Q. Right.
A. 90 percent.
Q. Okay.
A. Occasionally I represent individual policyholders in homeowners' claims or auto claims as personal counsel, and occasionally I -- I work with insurance agents and brokers, representing their interests in claims.
Q. Okay. How much of your time is spent on representing brokers?
A. Maybe 5 percent.
Q. You currently are prosecuting at least one claim for a policyholder against a client of this firm; isn't that correct?
A. Yes.
Q. Is that a yes?
A. Yes. I said yes.
Q. Okay. I'm sorry.
A. (Simultaneous speaking).
Q. I'm sorry. Your -- your voice falls off at a point. And maybe my hearing -- hearing's gone bad. That -- that could be another problem too.
Was -- is that the only case that

Q. Do you have any -- have you worked as a -- a general contractor?
A. No.
Q. Have you worked as a subcontractor?
A. No.
Q. Do you have any construction experience whatsoever?
A. Not formal, no.
Q. Okay. Did you interview anyone in formulating your initial opinions in your initial report?
A. No, I did not interview anyone.
Q. Okay. Did you interview anyone in formulating your rebuttal opinions contained in your rebuttal report, Exhibit No. 90?
A. No.
MR. LUDWIG: You know what, I think that's all the questions I have. I don't know if Shawn's got anything.
MR. EADY: Yes.

EXAMINATION

BY MR. EADY:
Q. Mr. Arguello, thank you for your time today. I've got some questions for you.
You reviewed some transcripts in

MR. LUDWIG: Correct.

MR. EADY: That's good for me.

(Whereupon, the deposition concluded at 12:37 p.m., July 1, 2021.)

EXHIBIT

1

Colorado Insurance Law Center
A Private Law Firm

Damian J. Arguello
Attorney at Law/Principal

March 11, 2021

***Via Email to jramirez@hollandhart.com***
***and saeady@hollandhart.com***

Jose A. Ramirez, Esq., Shawn A. Eady, Esq.
Holland & Hart LLP
555 Seventeenth Avenue, Suite 3200
Denver, CO 80202

RE: *6 West Apartments, LLC v. Ohio Casualty Insurance Company*
Civil Action No. 1:20-cv-02243
United States District Court for the District of Colorado
Expert Witness Opinions regarding Claims Handling

Dear Joe and Shawn:

As requested, this letter report sets forth my opinions concerning the handling of the claims made by 6 West Apartments, LLC ("6 West") under the subject builders risk insurance policy ("Policy") issued by The Ohio Casualty Insurance Company ("Ohio Casualty"). As requested, I have reviewed and evaluated the documents you provided to date in relation to Ohio Casualty's claims handling. This report summarizes my opinions thus far, the underlying reasons for them, and my observations following review of the materials provided, based on my background, education, training, knowledge, and experience summarized below and in my attached *curriculum vitae*. My professional opinions expressed in this report also serve to comply with the expert witness disclosure requirements of the Federal Rules of Civil Procedure.

Based on my review of the information provided to me, subject to supplementation based on the opportunity to review additional information as it is made available to me, my present opinions are that Ohio Casualty acted unreasonably and contrary to applicable insurance industry standards in investigating, evaluating, and responding to 6 West's claims, and that Ohio Casualty's handling of 6 West's claims violated Ohio Casualty's duty of good faith and fair dealing owed to 6 West.

**QUALIFICATIONS**

My current *curriculum vitae*, which includes my publications and presentations over the last 10 years, is appended hereto as Exhibit A. A list of cases in which I have testified in the past is attached as Exhibit B.

To summarize my qualifications, I have worked in and around the insurance industry since 1986 and have practiced insurance law for 16 years. My entire professional career has been devoted almost exclusively to insurance, including litigating insurance coverage disputes, evaluating and improving claims handling practices and procedures, prosecuting bad faith and other extracontractual actions, and advising on insurance coverage and risk management issues generally. During my career, I have reviewed and evaluated thousands of claim files, have provided legal and risk management advice to both policyholders and insurance companies concerning claims and coverage issues, have presented at programs and seminars concerning insurance-related subjects, and authored articles concerning insurance-related issues. I am familiar with insurance industry standards in Colorado and elsewhere, particularly regarding claims handling and broker liability issues. The opinions I set forth herein are based upon my background, education, training, knowledge, and experience.

Most pertinently, I started my professional career as a multi-line insurance adjuster with Crawford & Co. in 1991. I attended Crawford's one-month adjuster school in Atlanta, Georgia in Fall 1991. During my tenure at Crawford, I handled thousands of claims of different types, including general liability claims, bodily injury auto accidents, no-fault or personal injury protection claims, workers compensation, and commercial and personal property claims. I also conducted preliminary onsite investigations for in-house insurance adjusters and self-insured corporations and public entities.

In 1992, I became a workers compensation claims representative for CNA Insurance Companies, where I quickly progressed to senior claims representative and was assigned to investigate and handle high-dollar and sensitive claims, including workers compensation claims made by CNA employees. During my work at CNA, I handled thousands of bodily injury claims. I was licensed as an individual claims adjuster in Colorado, Wyoming, New Mexico, and Utah. In this role, I also supervised independent adjusters who investigated and handled claims in New Mexico.

In 1994, I was selected to be part of an elite group of CNA workers compensation adjusters from around the country assigned to a new Claims Reengineering team. The objective was to reengineer the workers compensation claims-handling process to achieve optimal results by identifying and implementing best practices. The project began with a review of closed files in 20 different offices to determine if the claims were handled according to best practices. Before

embarking on the review, the auditing team met in CNA's Chicago headquarters with the assistant vice president in charge of the project, the Executive Vice Presidents of Claims and Services, as well as the McKinsey & Company consulting team facilitating the project, to determine what constituted "best practices" for workers compensation claims, allowing for differences in state law around the country.

After identifying the best practices to be used to benchmark our review, the team spent a week in each selected CNA branch office reviewing closed files ranging from medical treatment only to permanent total disability cases. After reviewing each file from inception to close, the reviewer would determine whether best practices were followed and, if not, how they weren't followed and what the range of outcomes might reasonably have been had they been followed. During the six-month project I reviewed and evaluated over one thousand bodily injury claims.

After completing the file reviews in each office, the team gathered to review the compiled results for confirmation of the findings and consistency of the process. After the compilation review, I was selected for a smaller team tasked to work with the McKinsey team to analyze the results in detail and devise pilot projects in key areas to implement and test targeted changes to best practices. We spent approximately 90 days on that phase. Subsequently, over the next six months, I helped implement the attorney-reduction pilot program in the New York City-area branch office. Through education (such as focus groups comprised of actual claimants, case studies, and best-practices reviews) and implementation of certain measures (such as tracking returned phone calls, roundtable reviews for complex claims, and providing sensitivity training), we achieved a double-digit reduction in attorney representation during the pilot period, despite healthy skepticism from the New York adjusters.

I left the project after the New York pilot. I left because senior management expressed disappointment with the recommendations made by the reengineering team following the pilot projects. Senior management indicated that, rather than investing in additional training and education, smaller caseloads, and the other measures the reengineering team had recommended, senior management was expecting the reengineering team to advise how CNA could reduce claims administrative expenses and headcount. Up until this point, this reengineering project had differed from what I later learned about other McKinsey reengineering projects for other insurance companies that reduced adjuster autonomy in favor of systematic approaches that aimed to reduce overall claim payouts by employing a strategy of "deny, delay, and defend." The 1990s was a time when insurance companies moved away from traditional principles of insurance that emphasized long-term underwriting profits and delivering value to policyholders to a model that seeks to maximize short-term profitability by measuring quarterly results and delivering value to stockholders instead.

After leaving the project, I briefly took a job in CNA's Albuquerque office adjusting workers compensation claims but left a few months later to become the Claims Manager for the Albuquerque headquarters of top-20 commercial insurance brokerage Talbot Agency, Inc. My initial role there was to use my knowledge of best practices to facilitate claims-handling for Talbot's commercial property & casualty insurance clients to achieve optimal outcomes. During that tenure, I reviewed and critiqued the handling of thousands of claims.

While at Talbot, I obtained two insurance industry professional designations. First, I obtained my Associate in Risk Management designation in 1996. Second, I obtained my Certified Insurance Counselor designation in 2002, and maintained that designation through annual continuing education through 2012. I was also licensed as an insurance producer in New Mexico.

As Talbot grew through the acquisition of smaller agencies, I also assumed the additional role of errors & omissions coordinator. My duties included investigating and resolving E&O claims against Talbot companywide, coordinating with Talbot's CFO and general counsel and the risk management and legal group of Talbot's corporate parent, Safeco Corporation. In that role, I later helped develop and implement best practices for the brokerage to reduce its E&O exposure.

In 2001, I decided to enter law school, something I had considered after college but put off due to the economic conditions in Denver. I enrolled at the University of Denver Sturm College of Law to attend night school while I continued working full-time for Talbot, transferring to Talbot's Greenwood Village, Colorado office. I applied for and received The Chancellor's Scholarship, a full-tuition scholarship awarded to law students committed to public interest work. My proposal was to advocate for insurance consumers, which I continue to do today.

In law school, I received academic achievement awards in five courses, was selected for the University of Denver Law Review, and graduated in the top quartile of the 2004 class despite having worked full-time during law school, graduating in three years instead of the usual four for night students, and entering the day program my final year (thus effectively switching to a more competitive class). Between my second and third years, in 2003, I left Talbot to become a summer associate at the venerable Colorado law firm Davis Graham & Stubbs LLP ("DGS"), where I also clerked my third year. Because of my insurance background, I was immediately assigned an insurance recovery role related to environmental and mass tort claims.

Once I graduated and became a member of both the Colorado and New Mexico bars in 2004 and 2005, respectively, my work at DGS continued primarily in the insurance recovery area, including the prosecution of bad faith and unreasonable delay and denial actions. Occasionally, I also performed work for insurance companies, including performing regulatory work, drafting coverage opinions, and defending insurance agents and brokers against errors and omissions

**EXHIBIT A**

Colorado Insurance Law Center
A Private Law Firm

Damian J. Arguello
Attorney at Law/Principal

# DAMIAN J. ARGUELLO CURRICULUM VITAE

**February 17, 2021**

## SUMMARY



- Founder and Principal Attorney at Colorado Insurance Law Center, a private law firm representing commercial policyholders and assisting business attorneys and litigators with insurance issues
- Seasoned Colorado insurance law expert witness providing high-level case review, consulting expertise, and trial testimony in bad faith and insurance agent/broker liability matters
- Adjunct Professor of Insurance Law/Contractual Risk Transfer, University of Denver Sturm College of Law
- Educator, writer, and speaker to the bench, bar, insurance industry associations, business groups, and private companies on legal issues related to the insurance industry
- Influencer and Thought Leader on insurance and risk management issues
- Active community service provider

## EDUCATION

**University of Denver Sturm College of Law**

- J.D. (2004)
- Senior Staff Editor, Denver University Law Review
- Chancellor's Scholar
- Academic Achievement Awards in Lawyering Process I & II, Family Law, Mining Law, Hazardous Waste & Insurance
- Finalist, Hartje Objective Writing Award, Reese Persuasive Writing Award

**University of Denver Daniels College of Business**

- B.S.B.A. Management, with honors (1990)

- Defended insurance agents and brokers against errors & omissions lawsuits and counsel them concerning risk management, agency agreements, and internal corporate matters
- Advised insurance companies concerning insurance products, policy language, regulatory issues, and reinsurance matters
- Defended professionals against malpractice/professional liability lawsuits
- Represented clients in contract matters, including drafting indemnification and insurance provisions and negotiating and litigating contract disputes
- Represented clients in natural resources and environmental disputes, including toxic tort litigation
- Prosecuted and defended appeals
- Chaired DGS Diversity & Inclusiveness Committee (2013 – 2016)

**Talbot Agency, Inc.**, Albuquerque, NM & Englewood, CO (1995 – 2003)
*Errors & Omissions Coordinator & Claims Manager*

- Developed and implemented best practices standards for top-20 insurance brokerage, including conducting internal training and creating compliance and reporting system for agents and support staff
- Conducted internal investigations of errors & omissions claims
- Supervised outside counsel defending errors & omissions litigation
- Reported to general counsel, CFO, and parent corporation concerning errors & omissions claims and risk management issues
- As Claims Manager, liaised between brokerage's major commercial clients and insurers concerning coverage disputes, claims service issues, and loss control matters
- Supervised claims professionals in responding to client claims issues

**University of Denver Sturm College of Law** (Spring 2003)
*Research Assistant to Professor George "Rock" Pring*

- Researched and co-authored book sections concerning international mining abatement law

**American Civil Liberties Union** (Denver, CO, 2003 – 2004)
*Intake Volunteer*

- Processed and screened submissions from prospective clients

**Project Safeguard**, Denver, CO (2000 – 2002)
*Courtwatch Volunteer,* Pro Se *Divorce Clinic Volunteer*

- Monitored domestic violence case trends in Denver County Court
- Provided clients with *pro se* divorce guidance

**Latin American Research & Service Agency**, Denver, CO (2001 – 2002)
*Legal Intern*

- Researched legal issues affecting Colorado Latino community

**Colorado Soccer Referee Association**, Denver, CO (2000 – 2001)

- Officiated Youth Competitive and Adult Recreational Soccer Games

**New Mexico Soccer Referee Association**, Albuquerque, NM (1998 – 2000)

- Officiated Adult Recreational Soccer Games

**CNA Insurance Companies**, Chicago, IL, & Melville, NY (1994 – 1995)
*Claims Reengineering Team Member*

- As part of select Home Office team, worked with McKinsey & Co. consultants to audit workers compensation claims files to identify, develop, and implement best practices
- Led litigation reduction pilot in NYC branch
- Developed litigation reduction program rollout to all branches

**CNA Insurance Companies**, Denver, CO (1992 – 1995)
*Senior Claims Representative, Workers Compensation*

- Investigated, managed, and settled workers compensation claims in four states
- Supervised outside counsel defending contested claims
- Supervised independent adjusters in New Mexico

**Crawford & Company**, Englewood, CO, and Greeley, CO (1991 – 1992)
*Multi-Line Claims Adjuster*

- Investigated, managed, and settled CGL, auto, workers compensation, property, and PIP claims for insurer and self-insured clients, including field investigations and appraisals
- Supervised outside counsel defending contested and litigated claims

**Greengard Senter Goldfarb & Rice**, Denver, CO (1987 – 1991)
*Administrative Assistant*

- Performed billing and accounting tasks for insurance defense law firm

**CNA Insurance Companies**, Denver, CO (Summer 1986)
*Underwriting & Rating Assistant*

- Assembled insurance policies for underwriting group
- Assisted rating group with investigating prospective policyholders

**PUBLICATIONS**

- "Insurtech in Underwriting and Claims Processing," *The Brief*, ABA TIPS, Vol. 50. No. 2 (Winter 2021).
- "Insurer Bound by Agent's Representation of Additional Insured Status in Certificate of Insurance," *Colorado Insurance News* (November 2019)
- "Hail No! Your Insurance May Not Cover Water Damage from Hail Accumulation," *Colorado Insurance News* (September 2019)
- "Insurance Coverage for Cryptocurrency Risks – Not Cryptic but Not Settled," *Law Week Colorado* (August 5, 2019, *reprinted with permission in CBA Business Law Section Newsletter*, September 2019)
- "E-Scooters Are Everywhere Now, but Insurance Coverage for Riders Is Nowhere," *ABA Tort Trial & Insurance Practice Law Journal*, Vol. 54 Issue 2 (July 2019, *reprinted with permission in Insurance Research Letter*, Vol. 22, No. 8, August 2019)