CILC
Colorado Insurance Law Center
A Private Law Firm

Damian J. Arguello
Attorney at Law/Principal

April 26, 2021

***Via Email to jramirez@hollandhart.com***
***and saeady@hollandhart.com***

Jose A. Ramirez, Esq., Shawn A. Eady, Esq.
Holland & Hart LLP
555 Seventeenth Avenue, Suite 3200
Denver, CO 80202

RE: *6 West Apartments, LLC v. Ohio Casualty Insurance Company*
Civil Action No. 1:20-cv-02243
United States District Court for the District of Colorado
Rebuttal of Expert Witness Opinions from J.S. Held

Dear Joe and Shawn:

This letter constitutes my rebuttal to the March 11, 2021 Expert Report submitted by J.S. Held ("Held") in this matter. For the most part, the Held report isn't relevant to the insurance industry standards discussed in my initial report. However, in a few places, Held touches on insurance-related issues that warrant this rebuttal. Overall, Held ignores the gross failures of Ohio Casualty Insurance Company ("OCIC") in handling this claim, and Held's own role in causing OCIC to unreasonably delay and deny covered benefits to 6 West and ECCG. Those failures are obscured in Held's report.

***Held's Post-Filing Claim Investigation Perpetuates OCIC's Unreasonable Conduct***

As you know, in May 2019, about ten months after receiving notice of the damage to the units in late July 2018, OCIC retained Held to assist with the investigation and analysis of 6 West's losses. Specifically, Held characterizes that assignment as follows: "In May 2019, J.S. Held was engaged by the Insurer to evaluate 6 West's supplemental claims for Buildings 1, 3, 4, 5, 7 and 9." (Held Expert Report at 19.) Subsequently, it took Held nearly ten months to generate



EXHIBIT
B

numerous requests for information ("RFIs"), evaluate the various responses, and prepare its report.

Setting aside the facts that it took OCIC ten months to retain Held and it took Held another ten months to issue a report in this matter after missing numerous deadlines Held internally set for itself, Held now bases its expert opinions in part on a post-facto investigation of the weather during the period when the losses occurred and information that it claims shows that some units weren't even onsite when they were damaged. (Held Expert Report at 2-3.)

These opinions underscore two things. First, they highlight that OCIC and Held failed to promptly and thoroughly investigate this loss as required under the industry standards and OCIC's Claim Handling Guidelines referenced in my first report. Second, they highlight OCIC's ongoing unreasonable conduct in litigating this action.

The industry standard is to investigate thoroughly and promptly when the claim is first reported. That's the time to verify or challenge causation, such as the weather events that the insured claims caused the damages. Once the insurer has accepted causation, and partially paid the loss as occurred here, it's too late to renege on the promise to pay the remainder of the loss. Even Held acknowledges that OCIC already partially paid the claim. (Held Expert Report at 24 ("The Insurer has issued payment to 6 West under the policy in accordance for [sic] the As-Reviewed Total as adjusted for deductibles."))

This is the second matter involving OCIC I have been involved in where OCIC has attempted to deny payment to the insured  retroactively after it has admitted liability and partially paid the claim. The industry standard isn't to renege on promises to pay the full damage, even if the insurer has erred in admitting liability. That's the insurer's fault and its burden to bear. In those situations, the industry standard is for a reasonable insurer to chalk it up to error, use it as a teachable moment, and/or discipline the claims personnel involved in making errors that cause the insurer to pay unmeritorious claims.

This is certainly not to say that 6 West's claims are unmeritorious. To the contrary, 6 West has readily admitted that damage to the units related to craning and transportation were not weather related and thus not part of its claim. Rather, the point is that OCIC's and Held's retroactive adjustment flouts the industry standard of investigating promptly at the outset. Even if Held were right about damage not being associated with weather events – and I question that and leave it to other experts to address Held's methodology and conclusions – the industry standard isn't to reverse course retroactively to the detriment of an insured who is cooperating

and who has been forthcoming with its insurer about excluded losses. Rather, a reasonable insurer recognizes and accepts that it bears the risk of errors during the claims-handling process.

As I understand it, OCIC and Held contend that 6 West and ECCG failed to produce the detailed documentation necessary for Held and OCIC to evaluate the claims. However, OCIC and Held updated the RFIs numerous times, and asked for information that 6 West and ECCG repeatedly told them either didn't exist or wasn't available in the requested format. (*See*, *e.g.*, 6 West 005782; Shatto Dep. 133:17-22; 149:10-150:9; 153:13-156:17.)[1] From July 2018 through March 2, 2020, when Held finally produced its report, and March 23, 2020, when OCIC finally communicates its coverage position to 6 West, there is no mention of any concern by OCIC or Held that the weather didn't actually cause damage to the units (other than the craning and transport-related losses that 6 West and ECCG readily admitted were unrelated) or that certain units weren't onsite when they were damaged.

As discussed in my initial report, OCIC's Claim Handling Guidelines and insurance industry standards required OCIC to (1) promptly investigate the loss and (2) notify 6 West and ECCG immediately through a reservation of rights letter ("ROR") if any coverage problem was perceived. OCIC's own representative testified consistently with these standards. (*See*, *e.g.*, Shatto Dep. 34: 17-37:15.) Only now, deep into this litigation, is OCIC notifying 6 West of these coverage issues, long after claim payments were made and the investigation should have been complete. Thus, not only is Held – as a disclosed expert witness – conducting investigatory tasks that OCIC and Held should have performed literally years ago, OCIC is only now disclosing the underlying concerns. These actions both contribute to the ongoing delays in handling this claim and paying benefits that OCIC has admitted are due and owing and continues the same pattern of OCIC and Held constantly changing the bases for refusing to pay 6 West the full value of its losses, i.e., "moving the goalposts." This conduct falls far short of the industry standards that OCIC itself has recognized.

***Held's Opinions Rely on an Illusory "Standard"***

At several points in its report, Held opines that 6 West's contractor, ECCG, failed to meet supposed construction industry standards for contractors involved in builder's risk claims. For example, Held states:

[1] When I prepared my initial report, Mr. Shatto hadn't been deposed. I may supplement my original report with his testimony. Meanwhile, I have reviewed portions of his deposition testimony in preparing this rebuttal report.

> It is the industry standard that when a Builder's Risk loss event occurs on a project, the General Contractor implements rigorous record keeping to track the repair work performed using time tickets, assignment of separate cost codes or job numbers for tracking the costs, and a tracking of areas of damage by room and elevation with specific locations. None of these detailed items have been provided.

(Held Expert Report at 24.) Unsurprisingly, Held cites no objective, verifiable authority for the assertion that an insured's contractor is accountable for complying with any specific standard of care in relation to a builders risk claim. I am unaware of any such standard, nor would it be relevant if there were one.

First, to the extent Held is attempting to demonstrate that ECCG fell short of some theoretical standard of care for contractor negligence, neither 6 West nor ECCG has any negligence or other claims asserted against them in this action. Consequently, even if there were an applicable standard involved (and there isn't), it's irrelevant because there aren't any negligence claims against which it would be applied.

Second, I'm aware of no such standard in the insurance claims context and Held cites no verifiable authority for this *ipse dixit* opinion in support of such a standard. To the contrary, in my experience, insureds and their contractors possess a variety of experience and expertise. An insurer takes its insureds as it finds them, and some insureds are less knowledgeable about claims documentation than others.

Third, and consequently, it's OCIC's job to direct the claims. As noted in my original report, the industry standard for good-faith claims handling is for the adjuster to be in prompt and regular contact with the insured, to document those contacts, and to direct the claims-handling as the "captain" of the claim. (20210311 Arguello Report at 23, 24, 46.) OCIC's and Held's repeated requests for additional information caused delay and confusion for 6 West and ECCG. If OCIC wanted certain documentation to be created or retained, it was up to its adjusters to specifically inform 6 West and ECCG about this requirement, and the specific information it would need to retain to satisfy the requirement, from the outset of the claim. There is no documentation in OCIC's file regarding any such specific requests.

Fourth, Held's opinion seems designed to improperly suggest that 6 West and ECCG failed to cooperate with OCIC's and Held's investigation. In my experience as both an expert witness and insurance coverage attorney, it is becoming more common for insurance companies to claim

that an insured has violated its duty to cooperate, and to solicit expert opinions to address the alleged lack of cooperation.

As a claims professional, I was trained that an insured has a duty to cooperate but that we as adjusters must specifically request that the insured take or refrain from certain actions in cooperation with our investigation and defense of claims. Insureds and their affiliated parties (such as contractors) often lack the ability, knowledge, or experience to spontaneously provide information or otherwise cooperate with claims professionals.

That's why it so important that claims professionals and their retained experts provide specific direction to insureds to facilitate their cooperation. In fact, as I understand it, the recent practice of insurance companies aggressively raising noncooperation as a defense prompted the Colorado General Assembly to enact C.R.S. § 10-3-1118, a statute that specifies that an insurer must seek cooperation in writing and allow the insured specified timeframes to comply with that request. OCIC's claim file shows no such written communications with 6 West and ECCG. In fact, other than to repeatedly request information 6 West and ECCG told OCIC and Held didn't exist (because of OCIC's delayed investigation and lack of communications), OCIC voiced no concerns about its insureds' level of cooperation.

Fifth, and finally, the question of whether an insured or its contractor acted reasonably during the course of the claims handling is not a topic upon which expert witnesses should opine and instead, in my experience, this is a question for the jury. Held is attempting to graft onto these facts the illusion that there is an insurance industry standard to which a contractor in ECCG's position should comply. In reality, there isn't and, absent any verifiable third-party source, I view Held's attempt as an effort to deceive the jury into thinking there is.

***Held Unfairly Implies ECCG and 6 West Are Dishonest***

At several points in its report, Held states or implies that 6 West or ECCG are being dishonest. (*See*, *e.g.*, Held Expert Report at 2, noting "The claimed loss weather events are not documented in the project meeting minutes, schedule or ECCG Daily Journal – Weather, which provides doubt into the water damage occurring on site during construction" and "The quantity of repair claimed by the Contractor is unsubstantiated, and the square footage being claimed is inconsistent.")

Yet, Held completely disregards – or perhaps wasn't informed of – the fact that 6 West and ECCG were forthcoming in admitting that some separately accounted for and repaired damage had been caused during transport. (*See*, *e.g.*, 20210311 Arguello Report at 44, ¶ 123.) In

fact, as noted in my initial report, OCIC failed to properly investigate the claim at the outset, leading to an initial gross underpayment and OCIC's failure to preserve evidence and documentation, which in turn prompted OCIC to later question whether damage was caused by the weather events or transportation, all of which should have been investigated and documented by OCIC at the outset. (20210311 Arguello Report at 48.) Held's belated investigation and retroactive adjustment of the claim overlooks OCIC's breaches of its duty, as well as Held's inordinate delays in conducting its initial investigation.

***Held Claims Insured Failed to Adhere to Standards to Mitigate Damages but Disregards OCIC's Delays and Failures***

Held contends that 6 West and ECCG failed to adhere to "standard" mitigation of loss practices, such as making "flood cuts" in the damaged buildings' walls and delaying commencing the repair work, which impliedly violated the "insured's obligation to take action to protect the property from further water damage." As with its other opinions, Held cites no verifiable, objective sources for these supposed standards. Nor is Held's proffered "expert," Katie Twomey, an attorney or insurance professional, qualified to discuss an insured's supposed mitigation obligations under the policy, insurance industry practice, or applicable law.

More pertinently, Held's opinions fail to account for the delays and inept claim investigation and initial handling by OCIC, whose field adjuster inspected the initial loss on August 20, 2018. (*See* Held Expert Report at 27, Attachment 20.) OCIC had the opportunity to direct the insureds to undertake such mitigation actions or to commence repairs ASAP. It didn't. Held fails to account for this lack of direction and prompt claims handling by OCIC.

***Held's Reports Collectively Demonstrate OCIC's Failures***

As noted above, OCIC originally hired Held in May 2019 to "provide an analysis of submitted claim documents, as well as a detailed estimate based on a thorough review of the scope and photos provided by multiple parties involved." (23779974 ECF 000229.) Interestingly, Held's "detailed analysis" failed to mention any of the lack of mitigation, supposedly dishonest acts and omissions of 6 West and ECCG, or other bases for Held's opinions in its Expert Report. This, despite nearly 10 months of work to unearth such issues.

Moreover, in its Expert Report, Held implicitly and erroneously blames 6 West and ECCG for delays that limited Held to performing its work based on limited information:

> In May 2019, J.S. Held was engaged by the Insurer to evaluate 6 West's supplemental claims for Buildings 1, 3, 4, 5, 7 and 9. At this time, the majority of the repair work was complete. Consequently, J.S. Held was compelled to relying on photographs, schedules, project meeting minutes, and the initial inspection report (by others) in this review. J.S. Held on numerous occasions requested direct substantiation for the claimed supplement amounts (i.e. subcontractor daily report tickets for the repair work, photographs of areas that were repaired and other specific repair cost substantiation). 6West and ECCG failed or refused to provide such detail.

(Held Expert Report at 19.) Yet, in its March 2, 2020 report, Held implicitly concludes that OCIC failed to promptly engage Held to conduct an analysis of the loss when OCIC first investigated:

> The site was previously inspected by Liberty Mutual on August 13, 2018, and by John Whitfield (Pacesetter Claims Service) on November 13, 2018. Scope of Assignment J.S. Held LLC was not engaged on this project until May 2019; therefore, we did not have an opportunity to view the site immediately following the claimed loss events.

(23479974 ECF 000230.) Thus, the fact that Held's analyses were limited to after-the-fact photographs is a problem for which OCIC is solely culpable. Held studiously ignores this fact.

***Held Caused Some of OCIC's Claims-Handling and Payment Delays***

Held repeatedly stated, starting in January 2020, that it would provide a revised estimate and full report to OCIC Jim Shatto. (*See*, *e.g*., 20210311 Arguello Report at 50.) Yet, Held never changed its estimate from the one it completed in December 2019 and did not provide its final report to OCIC until March 2, 2020. Meanwhile, as early as May 13, 2019, Nate Santillanes (the producer who wrote the policy) and ECCG wanted to discuss OCIC's conclusions and claim payments but were told by Mr. Shatto that he could not deliver OCIC's written claim position without Held's evaluation report. Ultimately, Mr. Shatto didn't send OCIC's coverage position letter to 6 West until March 23, 2020.

***Held's Dual Role As Claims Investigator and Expert Witness Is Contrary to Industry Standards***

As noted above, Held assisted OCIC with investigating and evaluating 6 West's losses for ten months from May 2019 until March 2020. Therefore, I found it surprising that OCIC opted to engage Held to provide expert opinions in this action, particularly given the allegations and evidence of Held's role in unreasonably delaying the claims handling and payment of benefits in the first place. The standard in litigating insurance claims, particularly complex builders risk claims, is to engage separate persons or organizations to assist in investigating and evaluating claims and in providing expert witness testimony. The reason for separating these roles is to avoid an apparent conflict of interest because separation means the expert witness/firm has no stake in the outcome.

**<u>CONCLUSIONS</u>**

For the foregoing reasons, not only does Held's Expert Report fail to change the opinions stated in my initial, March 11, 2021 report, it actually reinforces those opinions in several ways. I continue to reserve the right to supplement or modify those opinions based on new information.

Respectfully,

Damian J. Arguello