# Katie Twomey

**Senior Managing Director**

Katie Twomey serves in the Builders Risk Group as the West Regional Lead. Katie brings extensive experience in contracts, scheduling, delay claim analysis, cost management and estimating for a diverse portfolio of projects.

Katie's career spans over 30 years as a construction industry professional, with more than $5 billion and 9 million square feet in construction projects for one of the nations top contractors, Clark Construction Group, LLC.

## PROFESSIONAL EXPERIENCE

**J.S. Held LLC** **July 2019 to Present**

Since 2019, Katie has worked on numerous consulting projects and disputes involving delay claims, cost claims, and other construction related disputes. Katie's work consists primarily of providing analysis and estimating of costs, determining project delay, and review of contract requirements"

- Mid Rise Apartments, Seattle, Washington. Estimating and schedule review for the restoration as a result of two independent construction incidents.
- High Rise Apartments, Los Angeles, California. Schedule delay claim analysis for 460,000 gross square foot, 24-story high rise residential tower with 347 residential units over two levels of underground parking.
- Low Rise Condominiums, Santa Clara, California. Single story reinforced concrete podium structure with three floors of wood framed residential units above. Estimating replacement of wood framed units, repair of concrete, estimated salvaged stored materials due to damage caused by a fire. Created schedule for reconstruction.
- Mid Rise Apartments, Denver, Colorado. Delay schedule analysis for a mid-rise building consisting of an eight-story apartment building with 178 units over two levels of basement parking.
- Low Rise Apartments, San Francisco, California. Water damage restoration cost review and estimating for repair of three six-story multi-family wood frame buildings.
- High Rise Office, Seattle, Washington. Restoration estimate and schedule for water damage in the 686,000 square foot 38-story office tower with 17,000 square foot of retail space and below grade parking. Concrete structure with stone and glass façade.
- Ethane Tank Project, Nederland, Texas. Restoration cost review and estimating for repair of a new 800,000 bbl refrigerated ethane tank damaged during windstorm in the course of construction.
- Commercial Warehouse Facility, Aurora, CO. Estimate and period of restoration schedule for approximately 150,000 square foot warehouse building under construction that experienced a roof collapse during construction.

EXHIBIT C

- Hotel Chain, Lewisville, TX. Schedule delay claim analysis for a four-story wood framed structure hotel with typical interior finish package. Water damage resulted in reconstruction of interior finishes.

CONSTRUCTION RELATED EXPERIENCE

During her tenure in the construction industry, Katie was well known and became highly respected for:

- Hands on construction knowledge in all aspects of construction
- Planning, scheduling and project budgeting
- Risk and strategy analysis expertise
- Consistent project success
- Diverse contractual delivery types
- Complex buildings and mega projects in all building types including
    - Convention Centers
    - Hospitals/Healthcare
    - Office Buildings
    - Data Centers
    - Civil and Tunnels
    - Federal Office Buildings

**Clark Construction Group, LLC June 1989 to June 2019**

Project Director - Washington State Convention Center Expansion, Seattle, WA. June 2016 to June 2019 As Project Director for the GC/CM delivery of the 1.4 million square foot, $1.2 billion project. Preconstruction started in 2016 and the main building construction started in 2018. The project included a subterranean Exhibit Hall with loading dock, retail, three levels of parking within the Exhibit Hall ceiling trusses, a Flex Exhibit Hall, two levels of Meeting Rooms and a 60,000 square foot Ballroom on the top level. The building is the first stacked convention center in the US, resulting in a focus on vertical transportation. Several "make ready" projects including: temporarily relocating a main artery to I5; relocation of transit buses; relocation of transit infrastructure; relocation of the major utilities and temporary bridges.

Project Director - Highland Hospital Acute Care Tower Replacement, Oakland, California August 2012 to May 2016. As Project Director on this $440 million, design-build project. The 592,000 gross square foot facility is being constructed in three phases: 1) Phase 1, completed in 2013, included the construction of an 80,000 square foot medical office building, built over a parking structure; 2) Phase 2, completed in 2015, features a nine-story, 169-bed acute care tower built above a below-grade Central Utility Plant and existing main utility tunnel; 3) During Phase 3, the existing inpatient tower was demolished and a one-acre interior courtyard, dining terrace, and connecting structures were built. The Highland Hospital project earned LEED Gold certification.

Preconstruction Director - San Diego Convention Center Expansion, San Diego, California – January 2012 to August 2012 The preconstruction for the San Diego Convention Center Expansion was a $460 million CM at Risk project that adds 1 million square foot of improvements to the existing 2.6 million gross square foot facility. The project scope includes expanding the exhibit hall space, adding meeting rooms, and constructing a new ballroom. Featuring a 5-acre green rooftop plaza, the project is designed to achieve LEED Silver certification.

Project Director - Camp Pendleton Naval Replacement Hospital, Oceanside, California January 2011 to July 2012 Katie was the Project Director for the $447 million construction of this 1 million gross square foot, design-build hospital replacement project at Camp Pendleton. The team was also responsible for the construction of a central utility plant, a 1,500-space parking garage, surface parking, and site development. The LEED Gold project was delivered six months ahead of schedule, $100 million under budget, and with over 2.5 million-man hours without a lost time incident.

Project Director - California ISO Iron Point Facility, Folsom, California January 2009 to December 2010 As Project Director provided design-build services for the construction of the California Independent System Operator (California ISO) New Iron Point facility. The 278,000 square foot headquarters is comprised of three distinct wings: the mission-critical wing to supports essential services; a five-story office wing for 500 employees; and a two-story public wing, which houses a main lobby, training rooms, a cafeteria, and support facilities. The project achieved LEED Platinum certification, surpassing the goal of LEED Gold.

Project Director - John Muir Medical Center, Walnut Creek, California August 2008 to December 2010 Katie was the Project Director on this project where she provided preconstruction and general contracting services for the $308 million construction of this new, 400,000 square foot, five-story, 242-bed tower, including an underground loading dock and a Central Utility Plant. The project also consisted of over 25,000 square foot of renovation within the active John Muir Medical Center.

Preconstruction Director - South Station, Boston, Massachusetts August 2007 to July 2008 Led planning for the $500 million, 49-story Class A commercial and mixed-use tower, rising above the South Station transportation terminal in downtown Boston. The entire project is planned to be built over 13 active rail lines that service all train traffic entering Boston, along with a 100,000 square foot bus terminal expansion and 300,000 square foot structured parking "podium" above the railyard. Led all discussion with Amtrak and MBTA during the preconstruction, including detailed sequencing, temporary fire life safety/evacuation plans, and rail-by-rail coordination with construction.

Project Director - McCormick Place Convention Center – West Expansion, Chicago, Illinois June 2003 to July 2007 Provided design-build services for the McCormick Place West expansion which is the fourth building at the McCormick Place campus. The innovative design included a transportation center that included rail, dedicated roadways, full range food service, a rooftop terrace and a drainage tunnel for rainwater directly to Lake Michigan. Katie lead the development and design-build process for the 2.3 million square foot project. The process included negotiations with the City of Chicago to add a storm water tunnel to Lake Michigan. Katie coordinated closely for air rights approval for adjacencies

Project Executive - General Motors Vehicle Engineering Center, Warren, Michigan January 2000 to May 2003 Provided overall management of the preconstruction and construction services for the $272 million, General Motors (GM) Vehicle Engineering Center in Warren, Michigan. This office building and design facility included an eight-story, 1.2 million square foot building and the renovation of an adjacent historic, three-story, 1 million square foot building. The new tower addition is a structural steel frame clad with a striking aluminum and glass unitized curtain wall system. The facility houses over 8,000 design engineers supported by the latest technology systems, labs, the famous GM modeling shop, and ancillary facilities. The facility includes the GM World Computing Data Center and specialty theaters for 3-D visualization.

Project Executive - Midwest Express Convention Center, Milwaukee, Wisconsin June 1996 to December 1999 Provided design-build services for this $125 million, 612,000 square foot exhibition hall and convention center. The largest design-build project ever undertaken in Milwaukee at the time, it provides the city with 200,000 square foot of exhibit space as well as a 38,000 square foot grand ballroom and 15,000 square foot of meeting rooms.

Project Manager - The Northern Virginia Center Graduate School, Falls Church, Virginia July 1995 to May 1996 Provided overall field and office manage for the construction of a satellite campus for Virginia Tech within the Washington, DC beltway. With many of the classes being held via internet from the main campus, the infrastructure of this building utilized cutting edge technology and flexibility for future technology. Additionally, Katie led the self-perform cast-in-place concrete effort. The project was delivered utilizing an aggressive schedule and was delivered in under 11 months.

Project Engineer – FBI, Clarksburg, WV August 1992 to June 1995 Purchasing, estimating, project coordination, scheduling, contract management for confidential federal project.

Project Engineer - Clark Foundation Group, Bethesda, Maryland June 1991 to July 1992 Preconstruction, design and construction of foundations, support of excavation, slurry walls, tunnels, and temporary bridges. Including projects for rail in Baltimore, MD and Chicago, IL; sewerage treatment plants in Boston, MA and Washington D.C.; and Higher Education in Virginia.

Project Engineer - Three Lincoln Center and Julliard School Dormitories, New York, New York June 1989 to June 1991 Provided management, including all cost and scheduling, for the 10-story base building with the two high rise towers, below grade parking and the renovation/upgrades of the Julliard School. Located at Amsterdam Ave between 65th and 66th Street, the project presented logistical challenges including preserving and building over an adjacent church. One tower contains high end luxury condominiums and the other tower is the student housing for the Julliard School. The base building consists of dance studios and Theaters.

## EDUCATION:

Katie is a graduate of Stevens Institute of Technology, Hoboken, NJ, where she received a Bachelor of Engineering.

REFERENCES:

Will be furnished upon request.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:20-CV-002243-RBJ

---

6 WEST APARTMENTS, LLC,

Plaintiff,

vs.

THE OHIO CASUALTY INSURANCE COMPANY,

Defendant.

---

VIDEOCONFERENCED DEPOSITION OF KATIE TWOMEY
June 16, 2021

---

VIDEOCONFERENCED APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
SHAWN A. EADY, ESQ.
JOSE A. RAMIREZ, ESQ.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, Colorado 80202
Phone: 303-295-8000
Email: saeady@hollandhart.com
Email: jramirez@hollandhart.com

ON BEHALF OF THE DEFENDANT:
JON M. LUDWIG, ESQ.
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202
Phone: 303-623-9000
Email: jludwig@lrrc.com

A. I can. Give me a moment. I didn't come with any paperwork. Okay. Yes, I have them.

Q. Okay. So let's start with -- take a look at the March 11, 2021, report. We'll go through that one first, okay?

A. Okay.

Q. Before we do that, we're going to talk about your CV, which I have because I'm going to enter that as an exhibit, so I'm going to open that up for us right now. That is one that I -- I emailed this. It is Exhibit Number 24. We're going to go through this real quick. What is your current position at J.S. Held?

A. I'm a senior management director in the Builder's Risk Group.

Q. Okay. And so what are your functions in that role?

A. I do review of claims related to primarily construction insurance issues, estimating, delay claims, that sort of thing.

Q. And you said it was related to insurance. Do you mean that you're typically hired by an insurance company to provide these services?

A. Yeah, most of my clients are insurance companies.

A. I was introduced to some of the people in the industry, but like I said, I was pretty new at the company and just, you know, becoming familiar with how a conference was held by the company.

Q. Have you been to any other conferences J.S. Held has put on for insurance companies since then?

A. I believe two webinars.

Q. Okay. Do you have materials from those webinars?

A. I do not.

Q. Okay. What were the webinars about?

A. The first one I went to was, if I remember, it was called Builder's Risk 101, and it talks about, you know, builder's risk claims and reviewing the claims.

Q. And were the two webinars held for insurance companies?

A. I don't remember the first one, whether it was just something that was blasted on the Internet and you could sign up. I don't remember if there was a focused audience or if it was just a J.S. Held general seminar. The second one was for, I believe, Alliance Insurance.

Q. What was the nature of the webinar for

Alliance Insurance?
A. It was a Builder's Risk 101 with a portion of estimating cost review and a portion of delay review.
Q. And you were not presenting the webinar, right?
A. I did participate in the second one for the delay analysis.
Q. And do you have the materials for that webinar since you were a presenter?
A. I do not. Our corporate -- we have a corporate library. They hold all materials. So they just put it up on the screen and you talk to it.
Q. Okay. Aside from this list of bullet-point projects -- and I assume these are all -- I'm sorry. I need to back up. Let me ask a better question.
Are these bullet-pointed projects all done with J.S. Held?
A. Can you scroll down so I can make sure that it's all -- yeah. When you get down to the hotel chain, that would have been the last one on that list.
Q. And is that all of the matters that you've worked on with J.S. Held or is this just a sample?
A. That is basically a sample.
Q. Okay. I don't see anything here that

specifically calls out residential construction where modular unit construction was the type of construction. So you haven't worked on that type of project, right?

A. A modular --

MR. LUDWIG: Objection, form.

A. Modular construction for J.S. Held, no.

Q. (By Mr. Eady) Okay. So you've never served as -- actually, this is your first deposition as an expert, correct?

A. That's correct.

Q. And you've never rendered an expert opinion related to modular construction such as that at this project, right?

A. Sorry. Can you repeat that. I kind of hear Jon at the same time.

MR. EADY: Hey, Jon, can you mute your mic.

Okay. So I'm sorry. Lisa, could you read my last question if you could hear it.

(The last question was read back.)

MR. LUDWIG: Objection, form.

A. I did not render an opinion prior to this, an expert opinion prior to this for modular construction.

Q. (By Mr. Eady) Okay. But you have done other expert opinions. That's the bullet points,

right?
A. No, this is my first formal expert opinion.
Q. Okay. So to answer the question, you've never rendered an expert opinion for modular unit construction, correct?
A. Until this point, no.
Q. Okay. Let's see here. So we've got a construction-related experience section here. And then we've got, just below that, Clark Construction Group. Am I correct that all of this construction-related experience was gained at Clark Construction Group from 1989 to 2019?
A. That's correct.
Q. Okay. Let's see here. When we say, "Hands on construction knowledge in all aspects of construction," am I to take that as swinging-a-hammer kind of work?
A. No, management --
Q. Okay. What is hands -- oh, hands-on construction means management?
A. Yes.
Q. Hold on. Okay. I don't see in this list here under the construction-related experience estimating. Should I read that into one of these bullet points or do you not have estimating experience?

A. I do have estimating experience. It is buried in the project budgeting.
Q. This right here, "project budgeting"?
A. That's correct.
Q. Have you ever done estimating for a residential project?
A. Let's see. I was -- yes, I was involved in estimating for several residential projects.
Q. Were any of those in Colorado?
A. No.
Q. So none of them were in the mountains of Colorado either, correct?
A. That would be correct.
Q. Okay. Are you aware of the market crisis for construction in the mountain region of Colorado?
MR. LUDWIG: Objection, form.
A. I am, and yes, there is information available and published regarding estimating different regions of the country.
Q. (By Mr. Eady) Okay. So what did you look at to get familiar with the construction cost market in the Colorado mountain region?
A. So I didn't specifically look it up myself. The Xactimate estimates that were utilized utilize the area of Colorado where the project is.

Q. Okay. So you didn't look into the Xactimate cost estimates that were utilized for this project in your expert report, right?
MR. LUDWIG: Objection, form.
A. I reviewed the Xactimate estimates. And on the cover sheet, it tells you what area the units are pulled from. So the area -- it has an index in Xactimate and pulls from those areas.
Q. (By Mr. Eady) But you didn't do anything to verify those Xactimate numbers were accurate, did you?
MR. LUDWIG: Objection, form.
A. Well, I used my construction experience and looked at the unit pricing and the square footage. And the unit prices were actually higher than average construction rates, so they seemed acceptable to me.
Q. (By Mr. Eady) If you used your construction experience, but you don't have any experience in the Colorado mountain region, how did your experience help you?
A. Many of my projects have been done in more expensive areas like San Francisco, New York, Seattle, and the rates used -- the unit rates used in Xactimate estimate were closer to a Seattle rate than to a Denver rate if you look in industry tables.
Q. But you didn't have any Colorado mountain

region experience to utilize in that analysis, did you?
MR. LUDWIG: Objection, form.
A. I did not, but you'll notice that the unit rates that J.S. Held used were higher than the insured used.
Q. (By Mr. Eady) Looking at your Clark Construction Group background, I don't see -- let me just make sure I'm not missing something here. I don't see any reference to a project that is a residential construction project. Am I missing something here?
A. Yeah, keep going. So Three Lincoln Center's 65-story New York City residential condo building and the Juilliard School dormitories, which is adjacent. They share the same base building -- it's a different construction -- is also a residential facility. And I worked on Bowles Hall at Berkeley. I was not the project officer or the lead for the project, so it doesn't show up in this listing, and that was residential.
Q. Were any of these modular unit construction similar to the project we're here to discuss today?
A. No.
MR. LUDWIG: Objection, form.
Q. (By Mr. Eady) You mentioned that you did have some modular construction experience not with

J.S. Held. Can you tell me where that was located or can you give me some background on that.

A. So while at Clark, I was part of a research and development group while I was living in California doing research on modular construction and if it could be applied to hospitals and other facilities that needed to come online quickly like dormitories for universities. I had a young woman that worked for me that had her -- did her master's thesis at Auburn in modular construction and traveled around the world. So she -- I engaged her in the review. We reviewed code compliance and how you bring modular construction online and try to achieve, you know, local jurisdiction requirements, which can be different anywhere in the country. And, you know, different things like unions, whether the union shops would need to go to the prefab facility.

I did engage in much prefabrication and when we did the prefabrication in California, we did it all in union shops and did the testing required for the project at those shops, did a -- I call it a tilt-up data center where all the interior of the building was prefabricated and put in place so that we could complete it in eight months. But because of the size of the building and the concrete and insulation

requirements, we did not do it as a complete prefabricated module. We did it more as prefabricated components that we put together at the site. And a lot of the focus had to be on how you interconnect the pieces to ensure that you are meeting code and wouldn't have default issues in the future.

Q. But you've never managed a construction project that was modular unit construction, correct?

A. That's correct. At Clark, when I embarked on this research and delivery -- research and development component, I want to say it was 2014 through 2016. And at the time, we found it not to be of value, so we did not proceed with full modular factory prefabrication.

Q. Okay. Thank you.

And then you've never offered expert opinions related to modular construction of the type that we have in this project, correct?

MR. LUDWIG: Objection, form.

A. That's correct. This is first project where we're providing that expert opinion.

Q. (By Mr. Eady) Did you reach out to anyone with respect to completing your report and that has expertise in modular unit construction?

MR. LUDWIG: Objection, form.

Q. Having no construction experience with respect to actually managing a modular unit construction project, that doesn't seem like sufficient research to me in order to render this report; would you agree?

MR. LUDWIG: Objection, form.

A. I disagree. Basically what's being built is a campus, and I've certainly built campuses before. And the order in which you put the pieces together of a building and following specifications in the drawings, which I do have a copy of, is pretty straightforward.

Q. (By Mr. Eady) Okay. So you think watching approximately three videos was sufficient research?

A. As I just mentioned, I reviewed the contract documents, which give you instructions as to the sequence of the box installation. You know, I certainly know how to calculate a crane pick and put a large piece of a building together. I mentioned that I've done prefabrication. So it's pretty straightforward on how to put these buildings together.

Q. Okay. I'm going to go to your report, if you want to get that in front of you. And this is -- again, we're going to go to the March 11, 2021, report.

A. Okay.

Q. Do we have page numbers here? I don't see

Oftentimes, additional general conditions falls into that category. If it's, you know -- normally additional general conditions is due to a delay on the project, so it usually falls under the soft cost items such as that. It's the things other than the hard costs of the repair, the physical repair.
Q. Do you believe 6 West is demanding soft costs in this matter?
A. As you can see in my report, I recapped the claims as submitted, and there was a submission in early 2019 through an email format of soft costs. I've since learned that that's been rescinded, but there was an initial soft cost from 6 West. And the general conditions can -- that's been pursued by ECCG can fall into that category also, and I've addressed that in both of my reports.
Q. Under the Summary of Opinions section, the second sentence, it says, "Detailed loss related cost documentation has not been provided." Has not been provided by who?
A. By the insured.
Q. And who is the insured in this case?
A. It's generically, I'll say, 6 West, and I'm going to refer to them as incorporating ECCG by affiliation.

Q. Okay. So you think ECCG is an insured by affiliation?
A. I do.
Q. What documents did you want to see that you haven't seen?
A. So if you look at the claims that were submitted -- and I recapped this in my report -- they were initial claims. And especially the one for Buildings 1, 3, 4, and 5 from the July 11th -- generically, I'm going to refer to July 11th and 13th as July 11th, if that's okay. But the July 11th loss, you look at the initial claim submission that had some supporting documentation from subcontractors/vendors for repair work, and that gets amended. And the insured submits a reference to an Xactimate estimate, but does not correctly refer to the quantities of damage. They refer to the buildings as a whole. And Xactimate on the last page, what it does is it recaps the complete square footage of the rooms that are reviewed, not just the damage locations. And you have to go through the estimate itself line by line to see the quantities.
Well, the insured winds up submitting all of the areas as if it was basically a total loss for all those units related to drywall and painting. And so to

try to understand the square footage they come up with, I -- you know, because from where I sit, resolution of a claim is the ultimate goal. So I went through all the documentations and tried to find more supporting documentation, were there change orders as in the original backup that had quantities and locations that could help decipher, you know, where the insured was coming up with their 125,000 or so feet of repair, you know. That's kind of -- the approach is to try to, you know -- my approach is to get to resolution. So are there any documents in all the files received, all the discovery that helps support that?

You know, I did find some indications that other change orders had, you know, complete backup of locations and photos and areas and hours of work. With the amended claim for 1, 3, 4, and 5, it was this lump sum. It was these letters drafted by date after the repairs were complete by the contractors that did the work. So I could -- you know, there was no substantiation to help decipher the locations of the repairs.

And Builders Risk, we don't normally use Xactimate or estimates to validate claims or to do our reviews. We usually use a subcontract agreement. Some projects are done on time and material where you have,

you know, daily reports of what's going on in the areas, how many workers, blah, blah, blah. You know, Evans Chaffee indicates, I believe, just going off memory here, that they had four carpenters and four painters doing repairs, yet there is no explanation of where they were working and when, which is bizarre in Builder's Risk.

I mean, in Builder's Risk, you know, as I mentioned you usually do time tickets and -- to substantiate the repair. And if you don't do that, you usually go out and have a scope of work and you get bids from people. But there is a defined scope of work so they can actually price it.

And, you know, that's -- you know, I was reviewing all the documents to try to find that information. And then when I did my supplemental report and received access to the CMIC system, I again went through every subcontractor related with the work and explored whether I could find additional documents from them supporting what work they did where.

You see in the 6 West documents, the Bates numbers are in like the 8,000s or something. You see in there where there was deficiencies from the plans, and some of that work was going to go towards the contractor on-site.

So it's just -- it was really hard to validate with all the other issues going on on the job and all the other documented issues with cracking and drywall problems, drywall missing that was supposed to be installed, the moving of work from the -- you know, that was supposed to be done off-site to move in with on-site. You know, it's -- the square footage in the claim just didn't make sense, and I just kept searching for backup information, and it doesn't exist.

Q. You didn't see any communications with respect to your review of the documents in this case where Liberty Mutual directed ECCG or 6 West on what documents they needed to produce in order to validate this claim, did you?

MR. LUDWIG: Objection, form.

A. I saw an email that -- and I don't remember the date, but it was -- Evans Chaffee had mentioned that they found more repairs that needed to happen, and Liberty said, Make sure you document everything. So there is an email out there, you know, indicating to document it like you would any other claim.

I mean, you can see in my supplemental report, there is information about how they had -- it was a restoration company come out -- and I can't remember the name, but it's in there -- and they fully

A. So I went through Buildings 1, 3, 4, and 5. And what I tried to do was correlate the square footage of drywall damage and try to determine the differential and the drywall damage between the as-claimed and the estimate and see if there is any more supporting information to increase that quantity.

So I think in this section here, I talk about validating the quantity of the estimate.

Q. And so what I'm saying here is how you validated Mr. Neufeld's work, did you go through the units and do measurements yourself -- what I call takeoffs -- of the units to see whether his quantities were correct?

MR. LUDWIG: Objection, form.

A. What I did was I used the Xactimate estimate, right? The information is -- you could export it to Excel. I had it exported to Excel. I compared the percentage of loss of the units in the drywall and reviewed the photos to see if there was a differential in the quantity. So I validated the quantities. I didn't do a new takeoff because there was no new information.

Q. (By Mr. Eady) Okay. Paragraph A on Page 24, Quantity of Repair, you say -- second sentence, "It is the industry standard that when a

Builder's Risk loss event occurs on a project, the General Contractor implements rigorous record keeping to track the repair work performed using time tickets, assignment of separate cost codes, or job numbers for tracking the costs, and a tracking areas of damage by room and elevation with specific locations."

Where does that industry standard come from?

A. In fact -- well, it's my experience, right, of what you do, but if you look at my supplemental report, the standard operating procedures set forth by Evans Chaffee utilizes this. And in change orders that I found in the supplemental report, they actually do this. So we know they are capable of doing it. Why they didn't, we don't know.

Q. Okay. I can ask the question again. I want to know not what ECCG has in their -- that you found in their system. What I want to know -- and we'll talk about that. What I want to know is where this claim that this is the industry standard with respect to builder's risk claims -- where that comes from.

A. So, one, it's my experience, right, both in construction and working for J.S. Held; two, you can find the detailed information in the rebuttal report that was provided that outlines the AACE documentation for cost changes.

Q. So documents -- so you're saying the industry standard comes from that reference in your supplemental report?
A. That's not what I just said. I said there is evidence --
Q. I'm asking you --
A. Go ahead.
Q. Go ahead.
A. I'm just saying there is evidence -- there is evidence that the contractor had a process in place that matches this industry standard.
Q. Okay. So where does the industry standard come from other than your experience? Is it just your experience?
A. It's also listed in the rebuttal report that was issued.
Q. What is listed in the rebuttal report?
A. An industry standard reference of the AACE.
Q. Okay. We'll get to that.
And is that industry standard specifically with respect to builder's risk loss events?
A. It's cost management on a construction project.
Q. Okay. Not specific to builder's risk claims?

A. We would have to pull it up and look at it. I'm not sure how he refers to it.
Q. You're aware that the work done to complete the repairs at Buildings 1, 3, 4, 5, 7, and 9 were done by change order with the subcontractors High Country and Sapphire by ECCG, correct?
MR. LUDWIG: Objection, form.
A. I was unable to track the exact -- that is one of the things I looked for in CMIC. I was unable to find specific change orders that matched the backup for the amended claims. So I don't know that for a fact. I can't follow with the information provided to track that those change orders were actually paid to those subcontractors.
Q. (By Mr. Eady) Okay. So if, for example, 6 West had paid ECCG for those change orders, that would tell you that it was paid at least by the insured, correct?
MR. LUDWIG: Objection, form.
A. 6 West -- ECCG submitted a change order and a demand for payment for 6 West. I saw documentation to that effect, and I believe that they were paid that amount.
I don't -- following down from ECCG, I can't find documentation that shows change orders to the subs

THE REPORTER: And do you need exhibits?
MR. LUDWIG: Yes, please.
THE REPORTER: And Mr. Eady?
MR. EADY: Same order. Thank you.
(Exhibits 24 and 25 were marked after the conclusion of the deposition.)

* * * * * * *

WHEREUPON, the foregoing deposition was concluded at 2:36 p.m. The total time on the record was 3 hours and 58 minutes.